# UNITED STATES BANKRUPTCY COURT

# DISTRICT OF IDAHO

| | | |
|---|---|---|
| IN RE | ) | |
| | ) | |
| **CLAY W. PREUIT and** | ) | **Case No.  12-02296-TLM** |
| **MARY E. PREUIT,** | ) | |
| | ) | |
| Debtors. | ) | **Chapter 7** |
| _____ | ) | |

## MEMORANDUM OF DECISION

## INTRODUCTION

In this case, the chapter 7[1] trustee, Jeremy Gugino ("Trustee"), objects to a claim of exemption by the debtors, Clay and Mary Preuit ("Debtors"[2]).  Trustee's objection raises the question of the boundary between allowable prebankruptcy planning and the improper or fraudulent transfer of assets to create exemptions. The issue here relates to Debtors' payment of almost $120,000 to Pacific Life Insurance Co. ("Pacific Life") to purchase a single premium annuity on March 14, 2012, two days before Debtors stipulated to a $280,000 judgment in favor of Washington Federal Savings ("WFS") in a state court action, and slightly more than six months before filing bankruptcy on September 19, 2012.

---

[1]  Unless indicated otherwise, all statutory references (*i.e.*, chapter, section, etc.) are to the Bankruptcy Code, Title 11 U.S. Code § 101-1539, and all Rule references are to the Federal Rules of Bankruptcy Procedure.

[2]  Where necessary, reference will be made to either "Clay Preuit" or "Mary Preuit" rather than to Debtors collectively.

MEMORANDUM OF DECISION - 1

The matter was tried on May 21, 2013, and taken under advisement following closing arguments on May 22. This Decision constitutes the Court's findings of fact and conclusions of law. Rules 7052, 9014.

**FACTS**[3]

Clay Preuit worked in the real estate title business from 1973 to 1996, initially as a title examiner and after 1980 as a title officer. At some point, he acquired an ownership interest in a title company, and he supervised employees including other title officers. In 1996, he sold his ownership interest and retired from the title industry.[4]

Debtors decided to start a business in which they would acquire and rent out single-family residences.[5] Some of these properties they purchased and then rented; others they purchased, renovated, and subsequently rented; and yet other rental properties they built with construction loans that were then converted into

---

[3] The facts are taken from the exhibits admitted into evidence, and the testimony of witnesses (both Debtors, Trustee, Dale Sullivan from WFS, and Debtors' financial advisor Gavin Parker). In regard to all testimonial evidence, the Court has considered the credibility of the witness, and the weight to be given his or her testimony, even where such factors are not emphasized in this Decision. The Court has also taken notice of its files and records in this case, and in the related adversary proceeding, *Gugino v. Pacific Life Ins. Co.*, Adv. No. 12-06070-TLM, under Fed. R. Evid. 201, to establish the course of proceedings and the date and nature of the filings.

[4] Debtors' birth dates appear on certain documents in evidence. Clay Preuit was born in 1948 and Mary Preuit in 1949. They were 65 and 64 respectively at the time of hearing. In 1996, they were 48 and 47, suggesting that when Clay Preuit "retired" from the title company, he was really changing careers, even if his new career would transition into retirement in the future.

[5] Clay Preuit testified they tried to keep the size of the single-family residential rentals to around 1,500 square feet. Additionally, he noted they had acquired a duplex and a triplex as part of their rental inventory.

MEMORANDUM OF DECISION - 2

long-term mortgage loans.  Debtors used the rents to service the underlying

secured debt, and ultimately sold the properties when sufficient equity had been

generated, particularly equity resulting from market appreciation.  This was, Clay

Preuit testified, their "retirement plan."  Debtors cashed in a 401(k) of around

$101,000 to commence that plan.  They used some $40,000 or $50,000 of this

amount to pay off the secured debt on one of the rental properties (a property that

later became Debtors' residence).  They invested the balance of the terminated

401(k) in their real estate business.

The business did well as the market thrived from 1996 to approximately

2006.  At its high point, in 2004-2005, Debtors owned 32 houses.  Rents generated

the cash flow needed for servicing the long-term debt on the properties.  Financing

for many of the properties was acquired through WFS.  Loans were also acquired

through Washington Mutual Bank (later Chase).  Debtors used the appreciation

realized on the sale of properties for their living expenses and invested any excess

in other properties.

However, as the real estate market softened, properties no longer had

appreciated value to satisfy the underlying debt and provide significant profit to

Debtors upon sale.  Additionally, some renters ceased paying rent, and some of the

houses stood vacant.  Debtors lost the ability to remain current on the WFS

obligations.

In early 2011, WFS began foreclosure on six of Debtors' properties.  After

MEMORANDUM OF DECISION - 3

foreclosure was completed, WFS sought a deficiency judgment in regard to five foreclosed properties through an Idaho state court lawsuit commenced in May, 2011.  The complaint alleged a total of $195,919.83 in deficiency liability, not including attorneys' fees or interest following the dates of the foreclosure sales.[6] An amended complaint added a count for a sixth foreclosed property, alleging an additional $44,153.58 deficiency, raising the total, before interest and fees, to $240,073.41.[7]

Debtors disputed WFS's claims.  Clay Preuit testified that Debtors objected to several aspects of WFS's alleged conduct, such as using appraisals prepared by "insiders," selling properties to insiders or "investors," not using the Multiple Listing Service in marketing the properties, and other actions that, in Debtors' view, unreasonably increased the alleged deficiency amounts.  Settlement discussions were unsuccessful, as was a late 2011 or early 2012 mediation.[8]  The litigation proceeded toward a scheduled April 16, 2012 trial.

During the litigation, Debtors sold several of their properties, satisfying the secured debt thereon and realizing a net amount payable at closing to them as sellers.  These were:

---

[6] Ex. 201.

[7] Ex. 205.

[8] Ex. 209.

MEMORANDUM OF DECISION - 4

| Date | Address | Payment to seller (Debtors) |
|------|---------|------------------------------|
| 07/08/11 | 4929 W. Ravenscroft, Meridian, ID | $25,951.24 |
| 10/07/11 | 934 S. Waterton, Eagle, ID | $38,934.08 |
| 10/19/11 | 275 S. Neskowin Way, Eagle, ID | $39,697.33 |
| 10/20/11 | 350 S. Kestrel, Eagle, ID | $38,005.60 |
| 02/24/12 | 1416 5th St., Nampa, ID | $18,878.40 |
| 02/28/12 | 2600 N. Capecod Way, Meridian, ID | $20,904.99 |
| 03/14/12 | 238 S. Neskowin Way, Eagle, ID | $41,234.87 |

These transactions[9] resulted in total recoveries by Debtors of $223,606.51.

The payments to Debtors on the first four sales, in July and October, 2011, were deposited into Debtors' bank accounts at Bank of America and Wells Fargo Bank.[10] The payments to Debtors on the February 2012 transactions, totaling $39,783.39, were made by check, which Debtors in some fashion negotiated at Idaho Central Credit Union ("ICCU"), where they also had an account.[11] However, Debtors' ICCU account statement for that month does not show any deposits in the amounts of the checks issued to Debtors at closing. There is a reference to a $10,000 deposit on February 24, 2012,[12] and there are cashiers checks, issued by ICCU and made payable to Debtors, on February 28, 2012, for

---

[9] *See* Exs. 204, 206, 207, 208, 213, 214, and 224 (documents including closing statements for each property). The secured creditor satisfied at closing was WFS on the two earliest sales (07/08/11 and 10/07/11) and Chase on the 10/19/11, 10/20/11, 02/28/12 and 03/14/12 sales. It appears there was no secured debt on the property sold on 02/24/12.

[10] *See* Exs. 204, 206, 207, 208.

[11] *See* Exs. 213, 214. When asked about these "multiple" accounts, Clay Preuit testified that, as old accounts were closed and new ones opened, there was a period of overlap when both accounts were active. However, Debtors never explained the reasons for changing banks during this period.

[12] Ex. 216.

MEMORANDUM OF DECISION - 5

$20,000 and on March 8, 2012, for $30,000.[13]  Each had a memo notation of "Pacific Life" added; Clay Preuit endorsed the February check and both Debtors endorsed the March check.[14]

In addition to the sales of properties, on February 9, 2012, Debtors borrowed $40,000, securing the same with real estate they owned in Riverside County, California (referred to by all parties as the "RV Pad").[15]  Clay Preuit testified Debtors needed the funds to live on, and used the $40,000 for that purpose and to pay attorneys' fees related to the WFS litigation.

In 2012, Debtors asked their accountant to recommend a financial planner. In early February 2012, Clay Preuit met with Gavin Parker, an independent financial advisor holding securities and insurance licenses.  Mr. Parker testified that Debtors' accountant, Ron Bowen, had offices in the same building and had told him that one of Bowen's tax clients was in the process of selling some rental properties and wanted to discuss investments to replace the income stream from those rentals.

Clay Preuit testified that, at the February 2012 meeting, he only told Mr. Parker that Debtors needed an investment vehicle for retirement, and they had or would soon have roughly $100,000 to $120,000 to invest.  He said he only briefly

---

[13]  Exs. 215, 217.

[14]  *Id.*

[15]  Ex. 210.

MEMORANDUM OF DECISION - 6

mentioned a pending lawsuit, and he did not mention or discuss the property foreclosures. Clay Preuit expressly testified that he did not mention to Mr. Parker the scheduled trial date in the lawsuit, nor anything about an impending judgment. He stated he did not inquire of Mr. Parker as to how annuities would relate to or protect against a potential judgment.

Mr. Parker's recall was quite different, and substantiated by his contemporaneously taken notes.[16] Mr. Parker testified that Clay Preuit mentioned the foreclosures and the potential judgment. His notes contain the phrase "To do: Are annuities protected from judgments in Idaho? (like bankruptcy)." Mr. Parker testified this was a question asked of him by Clay Preuit. Mr. Parker did not know the answer, and the "to do" notation was Mr. Parker's reminder to himself to check into it. However, Mr. Parker stated, the words "like bankruptcy" did not reflect Clay Preuit's comment but was something Mr. Parker independently put down.

About a month after this meeting, a March 5 email was sent to Mr. Parker from preuitclay@msn.com.[17] Clay Preuit acknowledged this was an address set up on Debtors' computer, but denied sending this email and said Mary Preuit had sent it. Mary Preuit testified she did not recall sending the email. (Other emails sent

---

[16] Ex. 238.

[17] Ex. 239.

MEMORANDUM OF DECISION - 7

by Debtors came from the address marypreuit@msn.com.[18])  The March 5 email

stated "We need to obtain an annuity with a stream [of payments] equal to or less

than [$] 1250 per month (that is the max protected.)"  It also quoted statutory

language (appearing to be the definition of an annuity from Idaho Code

§ 41-1836(3)), and further stated "Also, for your info, here is a court case the

attorney sent us for further explanation."  Attached was a copy of this Court's

decision in *In re Hall*, discussed further below.

On February 22, 2012, Mr. Parker acquired for Debtors a $40,000 annuity

from Lincoln Financial Group purchased with two separate payments of $627.00

and $39,373.00 respectively.[19]  These amounts match two checks: the first dated

February 9, 2012, payable to Debtors from "Sunset Escrow" for $39,373.00 and

the other from Debtors' ICCU account, dated February 14, 2012, made payable to

Clay Preuit for $627.00.[20]

Clay Preuit testified Debtors did not want the $40,000 annuity because it

was a "short term" annuity.[21]  He acknowledged Debtors thereafter gave Mr.

---

[18]  *See* Ex. 223.

[19]  *See* Ex. 211.

[20]  Ex. 237.  The February 9 date of the $39,373.00 check and the California address of
Sunset Escrow suggest that the $40,000 used to purchase the initial Lincoln Financial Group
annuity came from the loan taken on the RV Pad on February 9.  As noted above, Clay Preuit
claimed the RV Pad loan proceeds were used for living expenses and attorneys' fees, but he did
not substantiate those assertions.  He never explained the coincidental date and amount of the
check.

[21]  According to Clay Preuit's testimony, this annuity was a 15-year contract.  The later
(continued...)

MEMORANDUM OF DECISION - 8

Parker an additional $50,000 (the February 28 and March 8 ICCU cashiers checks, Ex. Nos. 215 and 217). These amounts were to be combined with the prior $40,000, and with another $30,000 to be provided, in order for Debtors to acquire a $120,000 annuity. Mr. Parker emailed several annuity options in such an amount to Debtors on March 8.[22]

On March 13, Debtors signed an application to purchase a single-premium payment annuity from Pacific Life Insurance Company ("Pacific Life"), for which they would pay $119,999.12.[23] These funds consisted of the surrendered $40,000 annuity, which realized $39,999.12[24] plus the $50,000 in ICCU cashiers checks described above, and an additional $30,000.[25] The source of this last $30,000 was the closing of the 238 S. Neskowin Way property on March 14. That sale netted $41,234.87 to Debtors.[26] The $11,234.87 remaining after obtaining the cashiers check was, according to Clay Preuit, used for living expenses and attorneys' fees.

---

[21](...continued)
acquired annuity, discussed below, was also a 15-year annuity. The issue Debtors had with the "term" of the $40,000 annuity was unexplained.

[22] Ex. 218.

[23] Ex. 219.

[24] *See* Exs. 221, 222.

[25] *See* Ex. 220 (ICCU cashier's check payable to and endorsed by Debtors with a "Pacific Life" notation).

[26] Ex. 224. These additional funds did not go through the ICCU account. Ex. 225.

MEMORANDUM OF DECISION - 9

The last of the necessary funds were delivered to Mr. Parker on March 14.[27]

Two days later, on March 16, 2012, Debtors stipulated to entry of a judgment in favor of WFS and to vacate the April trial date.[28]  The judgment, in the amount of $280,000, was later signed by the state court judge on May 17, 2012 and entered by the clerk on May 18, 2012.[29]

Debtors were represented in the WFS litigation by the law firm of Angstman Johnson.[30]  On September 5, 2012, Debtors paid that same firm $5,000 for purposes of a bankruptcy filing.[31]  Debtors' voluntary joint petition under chapter 7 was filed on September 19, 2012.

Debtors' schedules disclosed ownership of an Ada County residence,[32] the California RV pad, a Hawaii timeshare, and four rental properties in Ada and Canyon County, Idaho.  WFS was shown as a secured creditor on three of the

---

[27]  *See* Ex. 223 (emails).  The annuity documents were provided to Debtors by letter dated March 26, showing a "contract date" of March 26 and an "annuity date" of April 6.  Ex. 227. Debtors executed a receipt acknowledging delivery on April 3.  *Id.*

[28]  Ex. 226.

[29]  Ex. 228.  The judgment was subsequently recorded in Ada, Canyon and Valley Counties, Idaho.

[30]  Exs. 100-102, 200, 202-03.

[31]  Exs. 230, 231.

[32]  This residence (the rental property into which, years earlier, the 401(k) proceeds were invested) was owned free and clear.  The schedules showed it as unencumbered and worth $137,000.  Debtors claimed a $100,000 Idaho homestead exemption in the residence.  Trustee sold that property for $182,000, paid the exemption to Debtors, and retained approximately $34,500 to administer after splitting the proceeds with WFS under a prior agreement.  *See* Doc. Nos. 63, 64, 76, 84.

MEMORANDUM OF DECISION - 10

rental properties through "mortgages,"[33] and Chase was shown as secured by a mortgage on another. While the schedules suggest the presence of equity in most of these properties, Debtors acknowledge that with the exception of their residence and one other property, there really was no equity.

Debtors also listed the Pacific Life annuity on schedule B with a value of $117,500 and claimed the full amount thereof as exempt on schedule C under Idaho Code § 41-1836(1)(b). Question 10 of Debtors' statement of financial affairs ("SOFA") asked for disclosure of all transfers of property for the two years preceding filing, other than transfers in the ordinary course of business. Debtors responded "none."[34] On October 18, 2012, (the day of Debtors' § 341(a) meeting), Debtors filed an amended SOFA which, under question 10, disclosed seven real property sales from July 2011 to "early 2012." They identify $122,000 of the value received in five of those sales as "used to purchase [the] annuity listed on Sch. B." The $38,000 received from the other two sales is shown as used for living expenses and to pay taxes.[35] Following Debtors' October 18, 2012 amendments and the § 341(a) meeting on that same date, Trustee timely filed his objection to Debtors' claim of exemption in the annuity. Doc. No. 23

---

[33] Though recordation of a judgment creates a lien on property under Idaho statute, Debtors listed the WFS judgment on schedule F as an unsecured claim. In October, 2012, Debtors amended their schedule D to add WFS's judgment claim, though asserted that it was still fully unsecured.

[34] Ex. 230.

[35] Ex. 233.

MEMORANDUM OF DECISION - 11

("Objection").

Six weeks later, on December 20, 2012, Trustee filed a complaint against

Pacific Life, commencing Adv. No. 12-6070-TLM.[36]  In that suit, Trustee sought

judgment against Pacific Life as the recipient of a fraudulent transfer under

§ 548(a)(1)(A) and for recovery in the amount of $119,999.12.[37]  No answer was

ever filed.  However, on February 27, 2013, Trustee and Pacific Life filed a

stipulation for judgment, and their agreed form of judgment was entered by the

Court on March 6, 2013.  It states:

> 1.    Judgment is hereby entered in favor of Plaintiff Trustee, Jeremy
>       J. Gugino avoiding that certain voluntary transfer by Debtors of
>       $119,999.12 on March 26, 2012 to Defendant Pacific Life
>       Insurance Company for the purchase of a single premium
>       payment annuity contract pursuant to 11 U.S.C. §§ 542(a) and
>       548(a);
>
> 2.    Pursuant to 11 U.S.C. § 550(a)(1), Defendant is an "initial
>       transferee" from which Plaintiff may recover;
>
> 3.    Pursuant to the statutes set forth herein, Plaintiff shall recover
>       from Defendant only the remaining balance of said annuity of
>       $114,310.62;
>
> 4.    Said funds shall be turned over to the Trustee to be held pending
>       resolution of Trustee's Objection to Debtors' claim of
>       exemption in the same; and

---

[36] Ex. 234.

[37] The Court has reviewed the adversary cover sheet to assist in evaluating the cause(s)
of action alleged.  In addition to § 548, Trustee also referenced § 544(b), suggesting use of Idaho
state fraudulent transfer authority, though the complaint is not clear on that point.  Recovery
appears predicated on § 550, though there is reference to "turnover" and § 542.  *But see*
§ 541(a)(3).

MEMORANDUM OF DECISION - 12

5.      The parties shall bear their own costs and attorney fees as to this action.[38]

Copies of the stipulation and judgment were served on counsel for Debtors who had, on January 23, 2013, filed a request for notice in that adversary proceeding.[39] In fact, the parties agree that Debtors' counsel was given an opportunity to object to the form of judgment.

Notwithstanding paragraph 4 of the judgment, a subsequent March 4, 2013, email from Pacific Life's counsel to Trustee's counsel indicates Pacific Life – not Trustee – would hold the annuity funds pending resolution of the Objection.[40]  The funds have not been delivered to Trustee.

Trustee's Objection argues Debtors' claimed exemption contravenes the exception contained in Idaho Code § 41-1836(1)(a) that denies an exemption as to any amounts paid for or as a premium on the annuity "with intent to defraud." Debtors deny any such intent.

Trustee's Objection also asserts the exemption should be disallowed under § 522(g), on the theory that Debtors payment to Pacific Life was a "voluntary transfer" and that an exemption is barred in property Trustee "recovers" from Pacific Life (even though, at the time of the Objection, Trustee had not yet

---

[38]  Ex. 236.

[39]  Ex. 235.

[40]  Ex. 103.

MEMORANDUM OF DECISION - 13

commenced the suit against Pacific Life).

**DISCUSSION AND DISPOSITION**

### A.    Issues under § 522(g)

In relevant part, § 522 states:

(g) Notwithstanding sections 550 and 551 of this title, the debtor may exempt under subsection (b) of this section property that the trustee recovers under section 510(c)(2), 542, 543, 550, 551, or 553 of this title, *to the extent that the debtor could have exempted such property* under subsection (b) of this section *if such property had not been transferred*, if –

> (1)(A) such transfer was not a voluntary transfer of such property by the debtor; and
>
> (B) the debtor did not conceal such property[.]

Section 522(g) (emphasis added).  This Court has observed that: "The purpose of § 522(g) is to prevent a debtor from claiming an exemption in recovered property which was transferred in a manner giving rise to the trustee's avoiding powers, where the transfer was voluntary or where the transfer or property interest was concealed."  *Rainsdon v. Farson (In re Farson)*, 387 B.R. 784, 798 (Bankr. D. Idaho 2008) (citing *Hitt v. Glass (In re Glass)*, 164 B.R. 759, 764 (9th Cir. BAP 1994), *aff'd*, 60 F.3d 565 (9th Cir. 1995)).

On the date of filing, a bankruptcy estate is created.  The property of the estate, under § 541(a)(1), consists of all legal and equitable interests in property held by the debtor on that date.  *Rousey v. Jacoway*, 544 U.S. 320, 325 (2005). Under the Bankruptcy Code, a debtor may exempt property of the estate under

MEMORANDUM OF DECISION - 14

applicable law. *See* § 522(d). Because Idaho has "opted out" of the federal

exemptions, Idaho debtors may claim only those exemptions authorized under

Idaho law. *See* § 522(b); Idaho Code § 11-609.

Section 522(g) does not address initially claimed exemptions but instead

concerns a different issue. If a debtor transfers property or an interest in property

prior to the commencement of the bankruptcy case, the property to the extent

transferred cannot be claimed as property of the estate, as the debtor has divested

his rights and interests in it through such transfer.[41] If, however, the trustee avoids

that transfer, the trustee can recover the property so transferred, or its value, and

administer it as property of the estate. *See* § 550. Section 522(g) bars a debtor

from – at that point – asserting an exemption in the *recovered* property if (among

other things) the prebankruptcy transfer was voluntary.

Trustee argues § 522(g) is an appropriate and justiciable "second count" of

his Objection. The Court disagrees.

Debtors parted with money ($119,999.12) on March 14, 2012, prior to their

bankruptcy filing on September 19, 2012.[42] In return, they acquired an annuity or,

more accurately, the contractual rights under an annuity as the purchasers and

---

[41] "Transfer" is broadly defined by the Code, *see* § 101(54), and can include "disposing of or parting with – (i) property; or (ii) an interest in property." *See* § 101(54)(D).

[42] For present purposes, the Court uses the March 14 date, as the evidence suggests that was the date Debtors relinquished possession of the last of the funds to Mr. Parker for use in acquiring the annuity. In the context of this case, a more precise finding of the date of transfer is not required.

MEMORANDUM OF DECISION - 15

owners thereof.[43]  They claimed an exemption in these rights under Idaho Code
§ 41-1836, which protects "[t]he benefits, rights, privileges and options under any
annuity contract[.]"  *Id.*

What Debtors transferred to Pacific Life was cash, *i.e.*, the purchase price
for the annuity.  Trustee's suit under § 548 and § 550 was to recover the property
that was asserted to have been fraudulently transferred in March 2012, *i.e.*, the
funds.  Debtors have never claimed an exemption in this cash recovery; nor could
they assert an exemption in the property recovered given § 522(g) because "such
property" (the cash) was voluntarily transferred.[44]

The Court appreciates that Trustee argues the recovery was not solely of the
funds under § 548 but that the "annuity" itself was returned to the estate under the
"turnover" provisions of § 542.  But this argument is both circular and
nonproductive.  The annuity contract and the rights thereunder were "property of
the estate" at filing, as defined in § 541, and were so disclosed and scheduled by
Debtors.  While Trustee can demand turnover, there is an exemption claimed in
*that* property of the estate under Idaho Code § 41-1836, which is pending
adjudication.

It is true that property later recovered by a trustee also constitutes property

---

[43]  *See* Idaho Code § 41-1836(3) (describing an annuity as any obligation to pay certain
sums, at stated times, for a specified term, and issued for valuable consideration).

[44]  *Accord* Doc. No. 104 (Debtors' brief) at 12 n.3 (acknowledging the voluntary nature
of this transfer eliminates Debtors' ability to assert a post-bankruptcy § 522(g) exemption in any
§§ 548-550 recovery).

MEMORANDUM OF DECISION - 16

of the estate.  *See* § 541(a)(3) ("Any interest in property that the trustee recovers under section 329(b), 363(n), 543, 550, 553, or 723 of this title[.]").  Here, the judgment avoids the transfer of funds and recovers funds.[45]  Debtors have never claimed an exemption in such funds.

However, even if Trustee is arguing the annuity itself was also "recovered" and thus brought into the estate in such a fashion (though a nonsequitur because the annuity was already property of the estate), he must await Debtors' assertion of an exemption in *that* recovery before asserting a limitation on that exemption under § 522(g).  Trustee cannot avoid the adjudication of the Idaho Code § 41-1836 issues by claiming they are now rendered moot by a theoretically barred § 522(g) exemption.

And, finally, there is the problem, not squarely faced by Trustee, that he essentially seeks an advisory opinion.  When the Objection – containing the § 522(g) "second count" – was filed, there not only had been no recovery of any kind from Pacific Life, there had been no action commenced against Pacific Life.  Asserting that an exemption, if made, would be barred under § 522(g) presumed the occurrence of future events, including both recovery and the assertion by Debtors of an exemption in the property recovered.  The Court is prohibited from rendering advisory opinions.  *See Barr v. Matteo*, 355 U.S. 171, 172 (1957)

---

[45]    *See* Ex. 236 at ¶¶ 1, 3, 4.  That Trustee agreed to limit the recovery to the "present balance" of the annuity rather than obtain judgment for the full amount fraudulently transferred under § 548(a) need not be addressed in today's Decision.

(noting that "an advisory opinion cannot be extracted from a federal court by agreement of the parties, and no matter how much they may favor the settlement of an important question . . . , broad considerations of the appropriate exercise of judicial power prevent such determinations unless actually compelled by the litigation before the court"); *In re UAL Corp.*, 336 B.R. 370, 372-73 (Bankr. N.D. Ill. 2006) (concluding that "the judicial power accorded by Article III of the Constitution applies only to 'cases or controversies,' and so does not allow federal courts to decide 'abstract, hypothetical, or contingent questions.' . . . To be justiciable, a controversy must be one that calls for 'an adjudication of present right upon established fact.'").

For these several reasons, the Court finds Trustee's § 522(g) contentions misplaced.[46] That portion of the Objection will be denied.

## B.     Issues under Idaho Code § 41-1836

### 1.     Authorities

This Court stated in *Gugino v. Orlando (In re Ganier)*, 403 B.R. 79 (Bankr. D. Idaho 2009):

> [a] recent Ninth Circuit Bankruptcy Appellate Panel decision explains that even though not per se fraudulent, prebankruptcy transfers of nonexempt assets into exempt assets are also not per se insulated from avoidance. *Wolkowitz v. Beverly (In re Beverly)*, 374 B.R. 221 (9th Cir. BAP 2007), *aff'd* 551 F.3d 1092 (9th Cir. 2008).

---

[46] Given the Court's conclusions, it need not address the other arguments advanced by Debtors in response to Trustee's § 522(g) assertions.

MEMORANDUM OF DECISION - 18

. . .

As *Beverly* concludes, "[t]he perennial difficulty [is] that the boundary between a legitimate and a fraudulent exemption [is] difficult to discern. As explained in the contemporary *Collier* treatise, '[T]he distinction is often a close one and depends entirely on the facts.'" 374 B.R. at 244 (citing 1A Collier on Bankruptcy ¶ 6.11[3] (14th ed. 1978)). The upshot is clear, and not particularly surprising. Facts matter. The prebankruptcy conversion of non-exempt assets to exempt assets is not per se fraudulent, but neither is it per se proper and insulated from scrutiny and possible avoidance. There is no absolute safe harbor for bankruptcy exemption planning.

403 B.R. at 84-85. The question in this case, as in so many others presented to the Court, is whether the "facts [that] matter" support a conclusion that the boundary has been crossed and the exemption thus forfeit.[47]

This Court recently evaluated the purposeful acquisition of annuities shortly before bankruptcy, and a chapter 7 trustee's contention, as in the present case, that the exemption debtors asserted in such annuities was improper based on their fraudulent intent and should be disallowed. *In re Hall*, 464 B.R. 896 (Bankr. D. Idaho 2012). *Hall* summarizes the basic operative principles:

As the objecting party, Trustee bears the burden of proving that Debtors' claim of exemption is not proper. Rule 4003(c). Once the Trustee presents "sufficient evidence to rebut the prima facie validity of the exemption, the burden shifts to a debtor to demonstrate that the exemption is proper." *In re Wilcox*, [2008 WL 450816,] 08.1 I.B.C.R.

---

[47] And, as the Panel in *Beverly* observed: "Only two things are certain about the [boundary] line. First, . . . denial of discharge involving exemption planning requires that there be evidence other than the mere timing of the transformation of property from nonexempt to exempt status. Second, there is a principle of 'too much.' . . . The reality is that cases finding discharge-disqualifying intent to hinder, delay, or defraud creditors typically involve some combination of large claims of exemption and overtones of overreaching." 374 B.R. at 245 (citations omitted).

MEMORANDUM OF DECISION - 19

13, 14 (Bankr. D. Idaho 2008) (quoting *In re Hess*, 350 B.R. 882, 885 (Bankr. D. Idaho 2005)).  In Idaho, exemption statutes are liberally construed in favor of the debtor.  *In re Moore*, [349 B.R. 44, 46,] 05.3 I.B.C.R. 51, 51 (Bankr. D. Idaho 2005) (citing *In re Duman*, 00.3 I.B.C.R. 137, 137 (Bankr. D. Idaho 2000)).

464 B.R. at 903.

Here, as in *Hall*, the exemption at issue is claimed under Idaho Code § 41-1836(1).  That statute provides, in relevant part:

The benefits, rights, privileges and options which under any annuity contract heretofore or hereafter issued are due or prospectively due the annuitant, shall not be subject to execution nor shall the annuitant be compelled to exercise any such rights, powers, or options, nor shall creditors be allowed to interfere with or terminate the contract, *except:*

(a) *As to amounts paid for or as premium on any such annuity with intent to defraud creditors, with interest thereon*, and of which the creditor has given the insurer written notice at its home office prior to the making of the payments to the annuitant out of which the creditor seeks to recover.  Any such notice shall specify the amount claimed or such facts as will enable the insurer to ascertain the annuity contract, the annuitant and the payments sought to be avoided on the ground of fraud.

Idaho Code § 41-1836 (emphasis added).

*Hall* further explained that, in determining fraudulent intent under Idaho Code § 41-1836(1)(a), the Court may look to the provisions of the Uniform Fraudulent Transfer Act, Chapter 9 of Title 55, Idaho Code, and the construction of the same by the Idaho courts:

Because of the similarity in the language employed by the Idaho Legislature in both the Uniform Fraudulent Transfer Act and the statute governing the exemption of annuities, as well as both laws' purposes (*i.e.*, protecting creditors from fraudulent conduct by a debtor), the

MEMORANDUM OF DECISION - 20

Court in this case is informed by the list of factors provided in Idaho
Code § 55-913(2) for guidance in deciding whether so-called "badges
of fraud" are present in this case.

464 B.R. at 904.[48]  The Idaho statute states, in regard to such "badges" or indicia

of fraud:

(2) In determining actual intent under subsection (1)(a) of this section,
consideration may be given, among other factors, as to whether:

(a)  The transfer or obligation was to an insider;

(b)  The debtor retained possession or control of the
property transferred after the transfer;

(c) The transfer or obligation was disclosed or concealed;

(d)  Before the transfer was made or obligation was
incurred, the debtor had been sued or threatened with
suit;

(e)  The transfer was of substantially all the debtor's
assets;

(f) The debtor [absconded];

(g) The debtor removed or concealed assets;

(h) The value of the consideration received by the debtor
was reasonably equivalent to the value of the asset
transferred or the amount of the obligation incurred;

(i) The debtor was insolvent or became insolvent shortly
after the transfer was made or the obligation was
incurred;

---

[48]  The Court also noted that, because direct evidence of fraudulent intent is generally
unavailable, its existence "may be inferred from the presence of certain indicia of fraud or
'badges of fraud.'"  *Id.* (quoting *DBSI/TRI v. Bender*, 948 P.2d 151, 162 (Idaho 1997)).

MEMORANDUM OF DECISION - 21

(j) The transfer occurred shortly before or shortly after a substantial debt was incurred; and

(k) The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

Idaho Code § 55-913(2).  Further, the Court recognized that fraudulent intent is a factual determination.  *Hall*, 464 B.R. at 904 (citing Idaho Code § 55-908, providing that "In all cases arising under the provisions of chapters 5 to 9 inclusive, of this title [55], the question of fraudulent intent is one of fact, and not of law[.]").

The Court considers the various factors identified in Idaho Code § 55-913(2), to the extent they arguably apply to the evidence in this case.  In doing so, as this Court has often emphasized, such lists of factors provide useful tools for the Court in weighing and evaluating the evidence, but they are to be used in a qualitative, not merely quantitative, manner.  *In re Thorien*, 349 B.R. 59, 65 n.8 (Bankr. D. Idaho 2006).  "Mindful that such lists [of factors] are capable of being misconstrued as inviting arithmetic reasoning, we emphasize that these items are merely a framework for analysis and not a scorecard.  In any given case, one factor may so outweigh the others as to be dispositive." *Fjeldsted v. Lien (In re Fjeldsted)*, 293 B.R. 12, 25 (9th Cir. BAP 2003).[49]

---

[49] *Accord Beverly*, 374 B.R. at 236 ("No minimum number of factors tips the scales toward actual intent.  A trier of fact is entitled to find actual intent based on the evidence in the case, even if no 'badges of fraud' are present.  Conversely, specific evidence may negate an inference of fraud notwithstanding the presence of a number of 'badges of fraud.'").

Before applying such an approach here, the Court must address one other matter. Debtors argue *Hall* was in error, or at least less than precise, in holding that its decision was "informed by" the list of factors in Idaho Code § 55-913(2) and that it could utilize the same "for guidance" in evaluating issues under Idaho Code § 41-1836(1)(a). The reason, Debtors submit, is that Idaho Code § 55-913(2) concerns transfers made with the intent to "hinder [or] delay" creditors as well as transfers with fraudulent intent, while Idaho Code § 41-1836 addresses only transfers "with intent to defraud." Debtors posit, therefore, that the Court should limit its inquiry into any badges or indicia – and any circumstantial and inferential evidence therefrom – to solely those that relate to classic elements of fraud. Though raised only orally in closing argument, Debtors seem to suggest that these elements are (1) a representation of fact, (2) known to be untrue, (3) made with intent that the hearer rely, (4) the hearer justifiably or reasonably relied, and (5) suffered consequential injury. Of course, Debtors see none of these elements implicated here.

The Court finds the distinction strained. What is before the Court is not a debt incurred through fraudulent misrepresentation but, rather, an alleged "fraudulent transfer." The approach suggested would drastically limit the universe of potential fraudulent transfers to a small subset, negating a wealth of statutory and decisional law. There is no authority proffered by Debtors to support this construction. Nor is there any indication that the Idaho Legislature, in using the

MEMORANDUM OF DECISION - 23

words "paid . . . with intent to defraud *creditors*" in Idaho Code § 41-1836(1)(a),

meant to limit the construction of the provision and its applicability to situations

where such creditors were each recipients of knowing and intentional

misrepresentations.  To the contrary, the exception found in Idaho Code § 41-

1836(1)(a) relates to a fraudulent transfer of funds (*i.e.* "amounts paid") into an

otherwise exempt annuity, an issue congruent with fraudulent transfers generally,

and incongruent with fraudulent misrepresentation as urged by Debtors.

The argument is therefore rejected.  This Court is capable of limiting its use

of the "badges of fraud" (whether articulated under the Uniform Fraudulent

Transfer Act or appearing in decisional law) to those that are indicative of whether

Debtors had "intent to defraud creditors" in making the subject transfer.

As already noted, direct evidence of such an intent to defraud creditors –

such as an admission – is rare.  Generally, an evaluation of indirect and

circumstantial evidence, and inferences reasonably drawn therefrom, is required.

In addition to the authorities previously mentioned, the Ninth Circuit has stated

generally that:

> [a]mong the more common circumstantial indicia of fraudulent intent
> at the time of the transfer are: (1) actual or threatened litigation against
> the debtor; (2) a purported transfer of all or substantially all of the
> debtor's property; (3) insolvency or other unmanageable indebtedness
> on the part of the debtor; (4) a special relationship between the debtor
> and the transferee; and, after the transfer, (5) retention by the debtor of
> the property involved in the putative transfer.

*Acequia, Inc. v. Clinton (In re Acequia, Inc.)*, 34 F.3d 800, 806 (9th Cir. 1994).

MEMORANDUM OF DECISION - 24

"The presence of a single badge of fraud may spur mere suspicion; the confluence of several can constitute conclusive evidence of actual intent to defraud, absent 'significantly clear' evidence of a legitimate supervening purpose." *Id*. Once the trustee establishes indicia of fraud, the burden shifts to the transferee to prove some "legitimate supervening purpose" for the transfer. *Id*. The so-called "badges" of fraud are simply those "circumstances so commonly associated with fraudulent transfers that their presence gives rise to an inference of intent." *In re Roca*, 404 B.R. 531, 543 (Bankr. D. Ariz. 2009).

### 2.    Application

Context and facts matter. Here, Debtors first converted non-exempt equity into cash, and then converted the non-exempt cash into an exempt annuity. *Beverly* acknowledges that the attempted utilization or maximization of exemptions, even if on the eve of bankruptcy, is not fraudulent per se. Neither, however, is it per se proper, and in this case, multiple factors support a finding that Debtors had fraudulent intent.

Debtors met with a financial planner in February 2012. Clay Preuit's testimony about the nature of those meetings, the topics he raised and discussed, and the questions he asked, was certain and unequivocal. But it was substantially impeached. Mr. Parker stated, and his notes reflected that Clay Preuit expressly asked whether annuities would be protected from judgments. Moreover, on March 5, Debtors provided an email to Mr. Parker with a copy of the *Hall* opinion and

MEMORANDUM OF DECISION - 25

quotations from the Idaho Code provisions on annuity exemptions.[50]

Debtors moved quickly to transfer almost $120,000, consisting primarily of profits from the sale of their rental properties, to Mr. Parker in order to consummate the Pacific Life annuity purchase.[51]  Two days later, Debtors stipulated to a $280,000 judgment in favor of WFS.

Debtors were in the midst of litigation which did not appear likely to resolve.  Debtors engaged in a process of liquidation in which virtually all properties with equity were sold or otherwise encumbered.  The rapid timing of the sales, particularly those from October 2011 through March 2012, while embroiled in litigation with WFS, is noteworthy.[52]  After the sales and the transfer, Debtors were left with few assets of value other than exempt property (annuity, homestead, personal property).  And, despite having engaged in such a sweeping, recent change in assets and finances, Debtors failed to disclose these substantial transfers on their SOFA.

The totality of the facts and circumstances, and the inferences reasonably drawn therefrom, lead the Court to conclude the transfer was made with the

---

[50]  Ex. 239.

[51]  Additionally, Trustee established Debtors used multiple bank accounts and moved a majority of the funds at issue outside the accounts entirely by obtaining and endorsing over cashiers checks.  Though later called by his counsel and examined, Clay Preuit was never asked to comment on or explain the multiple accounts.

[52]  That Debtors' source of income then and for some time prior was property sales is acknowledged.  However, the number and magnitude of the sales indicates more than profit-taking to support living expenses and litigation.

MEMORANDUM OF DECISION - 26

requisite fraudulent intent.

Debtors note, though, that in *Hall*, where several similar factors were evidenced, the Court overruled an objection to an annuity exemption and characterized it as a "close case." They urge a similar result here. However, they read *Hall* too narrowly.

The objection that was overruled in *Hall* concerned a transfer to purchase a 2009 annuity and a bankruptcy filing eighteen months later in 2011. But the case also initially involved a February 2011 annuity of $53,135 (the "2011 Annuity") purchased one day after receiving a tax refund, where the debtors ran the tax refund through a relative's bank account and obtained a cashiers check payable to the annuity company. This was three weeks after negotiations with creditors, and shortly preceded the May 2011 bankruptcy filing. 464 B.R. at 902.[53] On the morning of the hearing on the objection, the Halls voluntarily withdrew their exemption in the 2011 Annuity, leaving only their 2009 annuity at issue. *Id.* at 903. After carefully considering all the evidence and inferences, including the badges of fraud, the Court noted:

> Here, with the exception of the 2011 Annuity, it cannot necessarily be said that Debtors converted non-exempt property to exempt property on the eve of bankruptcy. The sale of the home, and the purchase of the 2009 Annuity shortly thereafter using a portion of the proceeds, occurred eighteen months or so before Debtors filed their bankruptcy petition. However, Debtors' acquisition of the 2011 Annuity was just a few months before the bankruptcy filing.

---

[53] Unlike the instant case, the Halls disclosed the transfers on their initial SOFA. *Id.*

*Id.* at 909.  In context, and while the issue of conduct in 2011 was relevant and considered, the sole issue presented for decision in *Hall* was the objection to the 2009 annuity.  The language used by the Court suggests a potentially different conclusion as to the 2011 Annuity had it remained at issue.  The facts here are similar to those surrounding the 2011 Annuity in *Hall* and are not favorable to Debtors.

As a result of evaluating all the evidence, including circumstantial evidence and permissible inferences, and considering the credibility of the witnesses, the Court concludes the funds transferred to Pacific Life by Debtors in the spring of 2012 were "amounts paid for or as a premium on [ ] such annuity with intent to defraud creditors[.]"  Idaho Code § 41-1836(1)(a).

**CONCLUSION**

For the foregoing reasons, Trustee's Objection will be sustained, and the exemption disallowed.  Trustee shall submit a proposed form of order accordingly.

DATED: June 7, 2013



TERRY L. MYERS
CHIEF U. S. BANKRUPTCY JUDGE

MEMORANDUM OF DECISION - 28